# EXHIBIT 1

STATE OF RHODE ISLAND                          SUPERIOR COURT DEPT.
NEWPORT, SC.

| | |
|---|---|
| BHK REALTY, LLC, | ) |
| THE PALE, LLC d/b/a Buskers Pub | ) |
| and | ) |
| THE BODHI SPA, LLC | ) |
| (Class Representatives) | ) |
| *Plaintiffs* | ) |
| vs: | ) |
| | )      C.A. NO.: NC 19-0034 |
| ENBRIDGE, INC. | ) |
| NATIONAL GRID USA et al. | ) |
| *Defendants* | ) |
| | ) |

## AMENDED CLASS ACTION COMPLAINT
## (BUSINESSES)

Now come the above Plaintiffs who are the representative class members and allege and state the following cause of action against Defendants National Grid USA; National Grid plc; The Narragansett Electric Company d/b/a National Grid; National Grid USA Service Company, Inc., National Grid LNG LLC, Algonquin Gas Transmission LLC and Enbridge Inc., jointly and severally, alleging upon information and belief as follows:

## INTRODUCTION

1.   This is an action by Plaintiffs who were damaged by the Aquidneck Island Gas Service Interruption of January 21, 2019. "Newport Gas Crisis". The Plaintiffs' cause of action arises from the Defendants: (a) the distribution of natural gas in the State of Rhode Island and Massachusetts; (b) contracting to supply and/or sell goods in the State of Rhode Island; (c) doing or causing a tortious act to be done within the State of Rhode Island and Massachusetts; and/or (d) causing the consequence of a tortious act to occur within the State of Rhode Island.

2.   In January 2019, Aquidneck Island, Rhode Island was subjected to a natural gas outage of historic proportions (hereinafter "Newport Gas Crisis"). The young, the old, the infirmed, whole families and businesses have been impacted. Many of the town of Middletown and City of Newport's residents were forced to relocate, incur costs and otherwise suffer in the midst of a New England winter without heating and cooking gas. Businesses lost daily revenue, suffered spoilage and other losses and incurred, in some instances, damages from bursting water pipes, increased electric bills and other collateral effects.

3. Plaintiff's allege strict liability, negligence, and nuisance, and, among other things, the Defendants' failure to analyze, invest, and maintain the gas lines and infrastructure relied upon to supply and distribute natural gas to Aquidneck Island caused the Newport Gas Crisis. The Plaintiff's anticipate their further investigation and discovery will reveal other failures, actions, and inactions on the part of the Defendants.

## PARTIES

### Plaintiffs

1. That the Plaintiff, BHK Realty, LLC, is a domestic limited liability Company authorized to do business and doing business in the State of Rhode Island with a usual place of business located at 536 Thames Street, Newport, Rhode Island 02840.

2. That the Plaintiff, The Pale, LLC d/b/a Buskers Pub, is a domestic limited liability Company authorized to do business and doing business in the State of Rhode Island with a usual place of business located at 178 Thames Street, Newport, Rhode Island 02840.

3. That the Bodhi Spa, LLC, is a domestic limited liability Company authorized to do business and doing business in the State of Rhode Island with a usual place of business located at 654 Thames Street, Newport, Rhode Island 02840.

### Defendants

4. That the Defendant, The Narragansett Electric Company d/b/a National Grid is a Rhode Island Corporation with a principal place of business located at 280 Melrose Street, Providence, Rhode Island 02903.

5. That the Defendant, National Grid, plc is a multinational gas and electricity utility company headquartered in Warwick, United Kingdom. It is believed to be the parent company of the remaining National Grid Defendants.

6. That the Defendant, National Grid USA is an affiliate/subsidiary of National Grid, plc, a foreign corporation, believed to be organized under the laws of the State of Delaware and is headquartered at 40 Sylvan Road, Waltham, MA 02451, doing business in the State of Rhode Island, with a place of business located at 121 Terminal Road, Providence, Rhode Island.

7. That the Defendant, National Grid USA Service Company, Inc., an affiliate of National Grid USA, is a foreign corporation believed to be organized under the laws of the Commonwealth of Massachusetts and is headquartered at 40 Sylvan Road, Waltham, MA 02451, doing business in the State of Rhode Island, with a place of business located at 121 Terminal Road, Providence, Rhode Island.

8. That the Defendant, National Grid LNG LLC is a Rhode Island Limited Liability Company

with a principal office located at 280 Melrose Street, Providence, Rhode Island and an affiliate/subsidiary of National Grid USA Service Company, Inc.

9.     That the Defendant, Enbridge Inc. is a Canadian multinational energy transportation company based in Calgary, Alberta that transmits natural gas through its network of transmission lines throughout the United States, including Massachusetts and Rhode Island. Its stock is traded on both the Toronto and New York Stock Exchanges with a principal place of business in Canada at 200 Fifth Ave Place 425 -1st Street S.W. Calgary, Alberta Canada, doing business in the United States through its subsidiaries Enbridge US, located at 5400 Westheimer Court, Houston, Texas 77056 and Enbridge Energy Co. Inc. located at 1100 Louisiana St., Houston, Texas 77002.

10.    That the Defendant, Algonquin Gas Transmission Company ("AGT") is a Delaware Corporation located at 5400 Westheimer Court, Houston, Texas 77056, registered as a Massachusetts Foreign Corporation doing business at 1284 Soldiers Field Road, Boston, Massachusetts, 02110, that maintains and operates natural gas transmission lines and is a 1,100 miles (1,800 km) long pipeline system which delivers natural gas to New England.

11.    The Defendants are jointly and severally liable for each other's negligence, misconduct, and wrongdoing as alleged herein.

12.    At all material times hereto, the Defendants were the affiliates, subsidiaries, principals, agents, employees, servants, and joint venturers of each other, and in doing the things alleged in this Complaint, were acting within the course and scope of their authority and relationship as affiliates, principals, agents, employees, servants and joint venturers with the permission, knowledge, and consent of each other.

## BACKGROUND

13.    The Defendants supply and/or distribute natural gas to various residences and businesses located on Aquidneck Island, in the State of Rhode Island, including the towns of Portsmouth and Middletown and the City of Newport.

14.    Algonquin Gas Transmission Co. ("AGT"), an affiliate of Enbridge Inc., owns and manages a 1,140 mile gas transmission and pipeline system that has a stated capacity of 3.12 billion cubic feet/day (Bcf/d) and supplies major markets including Boston, Providence, Aquidneck Island, Hartford, and Cape Cod. AGT transmits gas from the southwest United States to the northeast via a series of compression stations and substations, referred to as Meter and Regulator station ("M&R") also referred to as "take stations", one of which is located in Weymouth Massachusetts. There are over 100 M&R's on the AGT system that supply local distribution companies and power plants. AGT designates subsystems within the AGT System.



Source: Spectra Energy

15. Locally, the AGT gas transmission pipelines deliver natural gas in what AGT refers to as the G-System, which consists of gas pipelines that extend from an M&R at Mendon Massachusetts (just North of Woonsocket, Rhode Island), that traverses, via a series of pipeline subsystems into Bristol County, Massachusetts, through Attleboro and Taunton, extending into Tiverton Rhode Island, where it crosses Mt. Hope Bay, with a termination at the Portsmouth, Rhode Island M&R. The Portsmouth M&R is at the tail end of the AGT G-System. The G-System is supplied with gas from, among other M&Rs, the Weymouth Massachusetts M&R. AGT is regulated by the United States Department of Transportation, Department of Transportation Pipeline and Hazardous Materials Safety Administration CFR Title 49(b)§ Chapter 1 Subchapter D-Pipeline Safety Sections 186, et seq. ("PHMSA")





16. The local gas distribution system on Aquidneck Island is owned and operated by the Narragansett Electric Company d/b/a National Grid and regulated by the Rhode Island Division of Public Utilities and Carriers. ("PUD")[1]

17. On Monday, January 21, 2019, Narragansett Electric Company d/b/a National Grid ("NG") shut down the Portsmouth Rhode Island M&R due to inadequate gas system pressure that resulted in 7,455 customers in the communities of Newport, Portsmouth, and Middletown, Rhode Island (NG's Newport system), to lose gas service and heat. The impacts of the outage caused Rhode Island Governor Gina Raimondo to declare a state of emergency in Newport County and activate the National Guard to assist the customers without gas service.

---

[1]

Narragansett Electric, (NG) has its own distribution system connected to the AGT transmission lines at meter stations (M&R's) located throughout Rhode Island, including the meter station located in Portsmouth. These stations, (also called "take stations" or "city gates") have two purposes: measurement of gas quantity, and pressure control. The transmission company (AGT) measures the amount of gas flowing into each station. NG reduces the pressure of the gas from the transmission lines to match the pressure of its own distribution system on Aquidneck Island. The gas pressure is controlled by regulators, a special type of valve. The regulators can reduce the gas pressure. If the gas pressure rises or lowers above set limits, NG regulators can shut off the gas flow entirely. On January 21, 2019, the minimum pressure set at the Providence M&R was 100 psi.

18. During periods of high demand, particularly in colder weather, it is sometimes necessary to supplement the natural gas supplied by AGT via the National Grid LNG, owned by the Defendant Narragansett Electric, whose liquid natural gas plant is located in Providence, Rhode Island (NG LNG), who provides supplemental gas to the G-System. AGT's gas transmission system, like most large gas transmission systems, has flexibility as to how it can operate under various conditions while meeting contractual requirements for pressure delivery and daily/hourly gas nominations to its local distribution companies. (In the case at bar, NG.) When operating near capacity, as here, the flexibility of the system becomes limited and is increasingly more sensitive to overtakes[2] and to operational upsets as occurred on January 21, 2019.

19. In the late summer and fall of 2018, hearings were held at the PUD about a proposal to construct a Cooling and Heating Plant (CHP) at the Newport Naval Base, which represented a $7,000,000.00 benefit to NG. During those hearings NG assured skeptical PUD members that there was sufficient capacity to supply Aquidneck Island with gas, even though they knew that the system's supply capacity into the M&R on Aquidneck Island was routinely 15% over maximum capacity and if a cold snap occurred that AGT would not be able to meet the additional load requirements.

20. Although, the CHP was not built, what is clear is that the desire for profits by NG, whose sales team received incentive bonuses for their gas sales, outweighed the risks and potential safety of its customers on Aquidneck Island.

21. Prophetically, a cold front moved into Rhode Island late on Sunday, January 20, 2019, and temperatures dropped from 27 °F to 1 °F by 6:00 AM on January 21st. Due to the cold temperatures NG significantly exceeded the amount of gas it had contracted for (overtakes) for transportation to customers through the AGT G-System supplying NG's local gas distribution network on Aquidneck Island.

22. On January 21, 2019, ALG and NG, due to their negligence, suffered operational upsets, which compounded the impact to the Algonquin pipeline system pressures that was already exceeding its capacity from overtakes by NG.

23. First, at 3:45 AM, there was an interruption in the power supply to National Grid's LNG plant in Providence that triggered an automatic emergency shut down (ESD) of the power plant resulting in multiple equipment failures and limited vaporization capabilities of their

---

2

An "overtake' is a request for the supply of gas that exceeds the maximum daily flow and/or hourly flow of gas contracted between Narragansett Electric and AGT.

LNG until 9:00 AM. NG LNG's sudden shutdown had an immediate and severe impact on the inlet pressure at the Portsmouth M&R.[3]

24. Because of the shut down, NG LNG was unable supply additional needed gas to the G-System and the source of additional gas supply shifted from NG LNG to the Algonquin G-System that had already exceeded its ability to supply gas to meet the demand by NG.

25. In response to the dropping system pressures, Algonquin attempted to bring on several of AGT's compressor stations, to supply additional gas, including one located in Burrillville, RI at 4:47 AM, that also supplied the G-System. The compressor unit could not be remotely brought online, and AGT dispatched a technician to resolve the issue in the field.[4]

26. At 6:21 AM, AGT attempted to increase gas supply into the AGT system by raising the flow rate of gas from AGT's Weymouth M&R. However, due to a meter configuration error by the AGT technicians in the fall of 2018, rather than increasing the flow rates, the flow rate decreased and therefore was unable to increase the desperately needed gas to the G-System supplying Aquidneck Island.

27. At 8:45 AM, AGT Gas Control contacted NG LNG to notify them of the meter issue and first learned, five hours after NG LNG's shut down, that there were unspecified problems at NG LNG.

28. At 10:06 AM, NG began receiving no gas calls, and around 10:30 AM they began mobilizing portable LNG resources to provide supplemental gas at the Portsmouth M&R. Thereafter the no gas calls continued through the day reaching over 1,200.[5]

---

[3]      Liquid Natural Gas must be heated via vaporization equipment to transfer it from its liquid state to a gaseous state, before it can be distributed to its customers. That function was performed at the Providence LNG station.

[4]

One of the most important components of the natural gas transport system is the compressor station. These stations usually located about every 40-70 miles along the pipeline perform the essential task of compressing natural gas as it travels through pipelines. It is this compression which allows the gas to continue flowing through the pipe and eventually to its final destination for distribution to refineries and other end users.

[5]
• **9:44 AM – NG LNG starts Compressor 1.**
• **9:45 AM – Emergency situation - Inlet pressure at the Portsmouth M&R drops to less than 50 psig.**
         **NG's National Response Center (NRC) report #1235735 states , that NG claims the loss**
         **of natural gas supply is due to unknown reasons. Report submitted at 9:32 PM.**
• **10:00 AM-11:00 AM – NG LNG vaporizes 2,800 MMBtu @194 psig.**
• **10:06 AM – NG starts receiving no gas calls.**
• **10:30 AM – NG begins mobilizing portable LNG operations.***

29. Due to inadequate planning, poor communication, unavailability of equipment and supplies and poor emergency response measures, NG was unable to mobilize and render operational supplemental LNG gas, that it had shipped to Portsmouth RI, resulting in the shutting down of the entire Aquidneck Island system. (Due to low gas pressures many of the customers had their pilot lights go out. Once gas service was restored, if the pilot light is out, free gas would disburse in the household, increasing the threat of explosion and the risk of injury or damage to its customers.)

30. In summary, the three failures that occurred, that led to the low pressures at Portsmouth M&R and the loss of gas to customers in NG's Newport System were due to: (1) the NG LNG Providence shut down and equipment failures; (2) overtakes by NG and other

---

- • 10:30 AM – NG LNG increases LNG send out into distribution systems supplied by AGT from their other LNG facilities in Wareham and South Yarmouth, Massachusetts, to reduce demand on AGT's G-System.
- ◦ 10:30 AM – NG requests an emergency gas supply at the Mendon M&R from Tennessee Gas Pipelines ("TGP"), (a separate gas distribution company that has an interconnection with AGT in Mendon).
- • 10:30 AM – Enbridge AGT Unit #8 Compressor @ Cromwell back in service.
- ◦ 10:53 AM – Enbridge AGT Unit #6 Compressor @ Southeast back in service.
- • 10:55 AM – AGT reprograms the meter, which resolves flowrate issue at Weymouth M&R. Normal operations resume with an outlet pressure of over 900 psig.
- • 11:00 AM-12:00 PM – NG Providence LNG vaporizes 5,000 MMBtu @ 127 psig.
- ◦ 11:22 AM – Pressure at inlet of Portsmouth M&R reaches low point, 36.4 psig.*
- • 11:23 AM – TGP Mendon compressor station is taken offline operationally but due to the pressure difference between Mendon and AGT system, continued to flow into the AGT system. As the pressure equalized, the flowrate of 6,666 MMBtu/hr continues reducing until flowrate was 0 at 11:53.
- • 11:00 AM – NG learns they will not have glycol for the portable LNG.*
- ◦ 11:06 AM – NG shuts off portion of the low-pressure system in Middletown to maintain pressure to larger system in Newport.*
- • 12:00 PM – NG has received >150 no gas calls.*
- ◦ 12:00 PM-1:00 PM – NG LNG vaporizes 3,500 MMBtu @ 125 psig.
- • 12:25 PM   TGP Mendon - After discussions between AGT and TGP gas control, the Mendon compressor station is brought back online and the flowrate resumes to 6,666 MMBtu/hr for the rest of the gas day.
- ◦ 1:00 PM – NG has received >370 no gas calls.*
- • 1:00 PM-2:00 PM – NG LNG vaporizes 3,000 MMBtu.
- • 2:00 PM – NG has received >650 no gas calls.*
- • 2:00 PM-3:00 PM – NG LNG vaporizes 4,000 MMBtu.
- • 3:00 PM – NG has received >965 no gas calls.*
- • 3:00 PM – Pressure on the G-System begins to increase toward normal conditions. Low-pressure system on the island remain unstable. Now more than 1200 NG calls.
- • 3:30 PM – NG plots outage calls and recognizes that they are spread across more segments of the gas system than expected and shuts down the system.

customers on AGT's G-system. Specifically while working to increase revenue, NG oversold gas transmission to AGT, and then did not properly maintain the Providence LNG facility, which left Aquidneck gas customers with no gas service on the coldest gay of the winter, a concern that had been brought to light by DPU commissioners questioning on the proposed Navy project in the fall of 2018. As the outage unfolded, NG publicly blamed AGT, without disclosing NG's responsibilities in creating the crisis, and (3) the Weymouth M&R's meter configuration error.

31.     Due to the Defendants' negligence, Aquidneck Island businesses and residents were without gas or heat for more than a week in one of the coldest periods in recent history.

32.     [(Subsequent to the gas outage investigations as to the root cause of the outage were undertaken by the Rhode Island Division of Public Utilities ("PUD") and the Office of Pipeline Safety, Accident Investigation, a division of United States Department Of Transportation, Pipeline and Hazardous Materials Safety Administration.("PHMSA").

33.     The Federal report was published on 8/13/19 and The Rhode Island PUD Report on October 30, 2019. Both Reports came to the same conclusion in that multiple factors contributed to the low pressure system on Aquidneck Island, culminating in the "Newport Gas Crisis".

34.     In summary, the precipitating factors documented in the report were:

            i. the meter programming error at Enbridge's affiliate AGT at the Weymouth MA substation ("M&R"), causing the gas regulation valve to malfunction;

            ii. National Grid's ("NG") forced shutdown of its Liquid Natural gas ("NG LNG") vaporization facility in Providence that made its LNG unavailable to supplement the low pressure on the G-System; and

            iii. The overtakes at the Portsmouth M&R take station. (See attached Rhode Island Public Utilities Division ("PUD") and ("PHMSA") reports attached hereto.)]

## CLASS ACTION

35.     Class Definition

Economic and Property Damages (E&P.D.) Class means the individuals and entities defined in this Section 41, subject to the Exclusions in Section 42 below. If a person or entity is included within the geographical descriptions in Section 41(A) or Section 41(B), and their claims meet the descriptions of one or more of the Damage Categories described in Section 41(C) that person or entity is a member of the Economic and Property Damages Class, unless the person or entity is excluded under Section 42(a-d):

## A. Individuals

Unless otherwise specified, all individuals residing on Aquidneck Island who, as of January 21, 2019, were customers of Narragansett Electric that lost gas who lived in, worked in, were offered and accepted work in, or owned or leased real or personal property located within, Aquidneck Island, Rhode Island.

## B. Entities

All Businesses that:
(a) owned, operated, or leased a physical facility on Aquidneck Island and sold products (i) directly to consumers or end users of those products or (ii) to another entity; or
(b) regularly purchased products on Aquidneck Island in order to produce goods for resale; or
(c) provided services while physically present on Aquidneck Island; or
(d) owned or leased real property on Aquidneck Island.

## C. Damage Categories

Individuals and entities who meet the descriptions of Sections 15(a) or 15(b) above are included in the E&P.D. Class only if their claims meet the descriptions of one or more of the Damage Categories described below:

a. Economic Damage Category: losses of income, earnings, and/or profits.

b. Real Property Damage Category: losses suffered by owners and lessees of real property located on Aquidneck Island, including frozen and ruptured water pipes.

c. Personal Property Damage Category: losses suffered by owners and lessees of personal property located on Aquidneck Island.

d. Evacuation Damage Category: losses suffered by those who evacuated their homes or businesses pursuant to voluntary evacuations.

e. Inconvenience Damage Category: losses suffered by those inconvenienced due to the loss of gas and heat.

36. Exclusions From the Economic and Property Damages Class Definition

Notwithstanding the above, the following individuals and entities are excluded from the E&P.D. Class:

a. Any E&P.D. Class Member who or which timely electing exclusion under any opt-

out procedure directed by the Court.

b. Defendants, and individuals who are current employees of Defendants.

c. The Court, including any sitting judges on the Superior Court of the State of Rhode Island, their law clerks serving during the pendency of this action, and members of any such judge's or current law clerk's immediate family.

d. Any companies that insure any parties or Class members against the losses alleged in this complaint.

37. The members of the Class are so numerous that a joinder of all members would be impracticable. Based on public information on the numbers of businesses harmed, interrupted, and persons displaced or otherwise affected, the Class of those with harm is in excess of 7,455 customers. {(Summary Investigation Into Aquidneck Island Gas Interruption of January 2019 pp (4).}

38. The Class is ascertainable. The Class definition identifies groups of unnamed Plaintiffs all of whom are businesses or individuals residing or owning property on Aquidneck Island in January 2019 by describing a set of common characteristics sufficient to allow a member of that group to self-identify as having a right to recover based on the description. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the Class members through notice disseminated by electronic means, through broadcast media, and published in newspapers or other publications.

39. A well-defined community of interest in questions of law or fact involving and affecting all members of the Class exists, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual Class members. This action is amenable to a class-wide calculation of damages, or the establishment of fair and equitable formulae for determining and allocating damages, through expert testimony applicable to anyone in the Class. The most significant questions of law and fact that will decide the Aquidneck Island litigation are questions common to the Class, or to definable categories or subclass thereof, and can be answered by the trier of fact in a consistent manner such that all those similarly situated are similarly treated in the litigation. The questions of law and fact common to the Plaintiffs and Class members, include, among others, the following:

a. Whether the Defendants knew, or with the reasonable exercise of care, should have known of the dangerous characteristics, properties, and potentialities of valve failure, but failed to take reasonable preventive measures to avoid this catastrophe;

b. Whether the Defendants, and/or each of them, breached their respective duties owed individually and/or collectively to the class members.

c. Whether the untimely automatic shutdown of the NG LNG's Providence LNG plant and resulting failure to supply gas from NG LNG's Providence plant to AGT's G-System contributed to inadequate gas pressure at AGT's Portsmouth M&R.

d. Whether the NG LNG ESD would have been prevented if NG LNG identified the cause of prior ESDs that occurred before the January 21, 2019 shutdown.

e. Whether NG LNG's failure to communicate the problems to Enbridge in a timely manner resulted in an inability of Enbridge or other gas suppliers to assist in mitigating the consequences of NG Providence LNG shutdown;

f. Whether NG LNG negligently failed to adequately investigate the automatic shutdown of the Providence LNG facility in November 2018 and resolve the problem with the UPS at that time thereby preventing the reoccurrence on January 21, 2019, contributing to the Gas outage;

g. Whether in the pursuit of profits and increased gas sales, NG negligently and routinely exceeded their contracted gas supply on the G-System that supplied Aquidneck Island leading to an the inevitable inability of AGT to meet the exceeded demand on the G system on January 21, 2021, precipitating the gas crisis.

h. Whether NG negligently balance gas takes among the various M&Rs on the G-System where they are limited to take the amount of gas nominated to individual M&Rs.

i. Whether based on NG's lack of communication with suppliers about the events on January 21, 2019, NG negligently failed to have a comprehensive understanding of the impact that the loss of the NG LNG Providence plant had on downstream systems, including the Portsmouth M&R, resulting in their failure to establish an LNG system in Portsmouth RI to supplement the supply of gas on cold days and in emergencies;

j. Whether negligent planning and forecast errors led NG to conclude that it did not need LNG vaporization capability to back up any low pressure emergencies;

k. Whether the failure by all Defendants to properly train and to supervise employees and agents responsible for maintenance and inspection of the natural gas lines led to the outage;

l. Whether the Defendants were negligent in their construction, maintenance, and operation of gas transmission line infrastructure, and/or other equipment;

m. Whether Defendants breached these duties to Plaintiffs and Class members;

-12-

n. Whether Defendants' actions or inactions were a substantial factor in causing harm to Plaintiffs and Class members;

o. Whether the Gas outage caused physical injury to Plaintiffs' and Class members' properties;

p. Whether the Gas outage interfered with or continue to interfere with the Plaintiffs' and Class members' comfortable enjoyment of their lives or property;

q. Whether Defendants have created a public nuisance;

r. Whether the Defendants have taken or have damaged the property, resulting in lost business profits or sales of Plaintiffs and Class members;

s. Whether Defendants have provided just compensation for having taken or having damaged the property of Plaintiffs and Class members;

t. Whether Defendants violated any Rhode Island or Federal statutes;

u. Whether class members have suffered from inconvenience due to the outage:

40. The class structure provides the remedies and structural mechanisms to best ensure the equitable treatment of claims against the Defendants arising from the Gas Outage including the proper measure of damages and formulae of allocation to each category of Class damages and losses.

41. Plaintiffs' claims are typical of the members of the Class. The evidence and the legal theories regarding Defendants' alleged wrongful conduct are substantially the same for Plaintiffs and all of the Class members.

42. Plaintiffs will fairly and adequately protect the interests of the Class members.

43. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection. Most recently, Plaintiffs counsel participated as one of the attorneys in the Lawrence Gas Explosion case against Columbia Gas that is presently in the process of being settled for $143,000,000.00. Plaintiffs and their counsel intend to prosecute this action vigorously.

44. The class action provides for the fair and efficient adjudication of this case or controversy. Even if any individual persons or group(s) of Class members can afford individual litigation, individual litigation of all claims would be unduly burdensome to the courts in which the individual litigation(s) would proceed. The class action device provides the benefits of unitary and inclusive adjudication, economies of scale, and comprehensive adjudication by a single court.

45. Prosecution of separate actions by all individual Class members may create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class, lead to the under inclusive, inconsistent or otherwise inequitable allocation of Defendants' available assets and insurance among similarly situated claimants, and/or lead to repetitious trials of numerous common questions of fact and law. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class.

46. That the class is so numerous and is in excess of almost 800 businesses that were affected and joinder of all members is impracticable.

## COUNT ONE
### Strict Liability - Ultra hazardous Activities - All Defendants

47. Plaintiffs reassert and re-allege all of the preceding paragraphs as if set forth herein in full.

48. At all times material hereto, Defendants owned, controlled, constructed, maintained, possessed, managed, supervised, provided and/or operated the supply and/or distribution of natural gas into Aquidneck Island.

49. At all times material hereto, Defendants owned, controlled, constructed, maintained, possessed, managed, supervised, provided and/or operated the piping infrastructure (including, but not limited to, vaporizers, compressor stations, processing plants, M&R take stations, valves (flow pressure and relief), expansion tanks, distribution lines, transmission lines, service lines, regulators and meters) which allowed for the transmission of natural gas into Aquidneck Island, Rhode Island.

50. At all times material hereto, Defendants knew or reasonably should have known that the infrastructure used to carry the natural gas into Aquidneck Island was inadequate during a cold spell and, among other things, susceptible to low gas flow and exhibited problems (or the potential for problems) with respect to gas pressurization.

51. At all times material hereto, Defendants knew or reasonably should have known that the infrastructure used to carry the natural gas into Rhode Island could not be owned, controlled, constructed, maintained, possessed, managed, supervised, provided and/or operated in a safe and reliable manner in the event of a cold snap in the region.

52. The supplying and transportation of natural gas involve matters of public concern, represent an inherently dangerous activity and should be carried out with extreme caution.

-14-

53. Plaintiffs have been damaged and suffered losses by reason of the Defendants' actions and/or inactions associated with its supply and transportation or natural gas in the context of the facts alleged herein.

54. By reason of the Defendants' actions and/or omissions, Plaintiffs were injured and incurred and continue to incur damages.

55. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered lost revenue, lost earning capacity, lost profits, increased expenses due to displacement, and/or inconvenience and other consequential economic losses in an amount according to proof at trial.

56. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to real property, including loss of use, benefit, goodwill, diminution in value, and/or enjoyment of such property in an amount according to proof at trial.

57. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to and/or a loss of personal property, in an amount according to proof at trial.

58. As a further direct and legal result of the Defendants' actions and/or omissions, Plaintiffs have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or related consequential damages in an amount according to proof at trial.

59. The damages and losses suffered by Plaintiffs were and are the kind of damages and losses that would reasonably be expected, or should have been reasonably expected when supplying and distributing natural gas in the context of the facts as so far known.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## COUNT TWO
### Negligence
### The Narragansett Electric Company d/b/a National Grid; National Grid USA Service Company, Inc.; National Grid LNG LLC

60. Plaintiffs reassert and re-allege all of the preceding paragraphs as if set forth herein in full.

61. The "Newport Gas Crisis" was a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of Defendants, and/or each of them.

62. Defendants, and/or each of them, owed Plaintiffs a duty of reasonable care in their ownership, control, construction, maintenance, possession, management, supervision, provision, and/or operation of the supply and distribution of natural gas to Aquidneck Island, including the City of Newport.

63. Defendants, and/or each of them, owed Plaintiffs the statutory duties set forth at Title 39, *et seq.* Of the Rhode Island General Laws as well as those laws and regulations imposed under the guidelines promulgated by the US Department of Transportation, codified in the Pipeline and Hazardous Materials Safety Administration ("PHMSA")

64. It was also the duty of the Defendant corporations to provide natural gas products at a safe pressure. Defendant Enbridge/Algonquin were well aware of the devastation that could result from under pressurized gas lines.

65. On the day of the gas outage, the lines were under pressurized due, among other factors, to an improperly programmed valve that controlled the flow of gas from the Weymouth M&R Station to the Aquidneck Island M&R Station.

66. The restriction of gas resulted in the unsafe pressure which was the direct result of Defendants' failure to reasonably inspect, repair, maintain, update and monitor their gas transmission lines.

67. The Defendants knew, or with the reasonable exercise of care, should have known of the dangerous characteristics, properties, and potentialities of valve failure gas lines but failed to take reasonable preventive measures to avoid this catastrophe.

68. The Defendants, and/or each of them, were negligent and breached their respective duties owed individually and/or collectively to Plaintiffs by, including but not limited to:

a. The negligent failure of NG LNG to investigate, identify and resolve the cause of an unexplained automatic shutdown in November 2018 of the NG LNG plant in Providence. (the ESD that previously occurred.) (The January 21, 2019 untimely automatic shutdown of the NG LNG's Providence LNG plant and resulting failure to supply gas from NG LNG's Providence plant to AGT's G-System was one of the critical precipitating factors in the Newport Gas Crisis)

b. NG LNG did not communicate the shutdown problems to Enbridge in a timely manner resulting in an inability of Enbridge or other gas suppliers to assist in mitigating the consequences of NG Providence LNG shutdown.

c. NG and other customers on the G-System relied on supply from AGT when their gas usage significantly exceeded their nominations during the coldest and most operationally sensitive part of the day. Historically, there were multiple occurrences when usage exceeded nominations on the G-System.

-16-

d. NG negligently failed to understand their right to balance gas takes among the various M&Rs on the G-System, resulting in an overtake of the Portsmouth M&R on January 21, 2019, precipitating the crisis.

e. NG failed to have a comprehensive understanding of the impact the loss of the NG LNG Providence plant had on downstream systems, including Portsmouth, resulting in their failure to establish an LNG system in Portsmouth RI to supplement the supply of gas on cold days and in emergencies.

f. Negligent planning and forecast errors led NG to conclude that it did not need LNG vaporization capability on Aquidneck Island to back up any low pressure emergencies.

g. failed to properly train and to supervise employees and agents responsible for maintenance and inspection of the natural gas lines;

69. By reason of the Defendants' actions and/or omissions, Plaintiffs were injured and incurred and continue to incur damages.

70. By reason of Defendants' actions and/or omissions, Plaintiffs have suffered lost revenue, lost earning capacity, lost profits, increased expenses due to displacement, inconvenience and/or other consequential and economic losses in an amount according to proof at trial.

71. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to real property, including a diminution in value and a loss of use, benefit, goodwill, and/or enjoyment of such property, in an amount according to proof at trial.

72. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to and/or loss of personal property, in an amount according to proof at trial.

73. As a further direct and legal result of the Defendants' actions and/or omissions, Plaintiffs have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## COUNT THREE
### Negligence: Algonquin/Enbridge

74. Plaintiffs reassert and re-allege all of the preceding paragraphs as if set forth herein in full.

75. The Newport Gas Crisis was a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of Defendants, and/or each of them.

76. The Defendants, and/or each of them, owed Plaintiffs a duty of reasonable care in their ownership, control, construction, maintenance, possession, management, supervision, provision, and/or operation of the supply and distribution of natural gas to Aquidneck Island.

77. The Defendants, and/or each of them, owed Plaintiffs the statutory duties set forth at Title 39, *et seq.* of the Rhode Island General Laws as well as those laws and regulations imposed under the guidelines promulgated by the US Department of Transportation, codified in the Pipeline and Hazardous Materials Safety Administration ("PHMSA").

78. It was also the duty of the Defendant corporations to provide natural gas products at a safe pressure. Defendants were well aware of the devastation that could result from under pressurized gas lines.

79. Enbridge/Algonquin's Gas Transmission system, like most large gas transmission systems, has flexibility as to how it can be operated while meeting contractual pressure and flow obligations and daily/hourly gas nominations with NG. When operating near operational capacity, the flexibility of the system becomes limited and sensitive to operational upsets or to gas usage exceeding forecasted or nominated volumes.

80. On January 31, 2017 NG exceeded the forecasted and contracted flow and volume of gas usage with Enbridge, at the Portsmouth M&R requiring an increase of flow from Enbridge/Algonquin.

81. In attempting to increase the flow of gas to Portsmouth RI, Enbridge/Algonquin attempted to activate and open a valve at its' Weymouth M&R. However, due to operator error and negligence in the programming of the ultrasonic meters that controlled the valve that regulated the flow of gas from the Weymouth M&R to the Portsmouth M&R, the meter caused the valve to close rather than open, further exacerbating the low-pressure at the Portsmouth M&R.

82. The error in programming was due to the failure of operational readiness, contingency planning, system enhancements, and enhanced communication by the Defendant.

83. The operational error was preventable and said failure was further exacerbated by the negligent failure to mitigate the error once it had been discovered due to the failure of operational readiness, contingency planning, system enhancements and enhanced communication among its employees and the other Defendants.

84. The Defendants knew that the 4 mile 6" pipeline at the tail end of Enbridge's G-System that feeds the Portsmouth M&R is the most vulnerable location on the G-System to a large pressure drop and failed to take contingency actions to alleviate the dangerous system.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## COUNT FOUR
### Private Nuisance

85. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

86. Plaintiffs and Class members own and/or occupy property at or near the site of the gas outage on Aquidneck Island. At all relevant times herein, Plaintiffs and Class members had a right to occupy, enjoy, and/or use their property without interference by Defendants.

87. Defendants' actions, conduct, omissions, negligence, trespass, and failure to act resulted in a loss of gas and a foreseeable obstruction to the free use of Plaintiffs' and the Class members' property, invaded the right of Plaintiffs and Class members to use their property and interfered with Plaintiffs' and the Class members' enjoyment of their property, causing Plaintiffs and Class members unreasonable harm and substantial actual damages constituting a nuisance pursuant to Rhode Island law.

88. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members sustained loss and damage, including but not limited to damage to property, discomfort, annoyance, and emotional distress, the amount of which will be proven at trial.

89. As a further direct and proximate result of the conduct of Defendants, Plaintiffs seek the reasonable cost of repair or restoration of the property to its original condition and/or loss-of-use damages.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, as well interest costs and attorneys fees, as an order enjoining the Defendants from operating the Infrastructure, gas transmission lines and equipment in an unsafe and harmful way and requiring the Defendants analyze, identify and correct deficiencies as well as implement processes and procedures.

## COUNT FIVE
### Public Nuisance

90. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

91. Defendants owed a non-transferable, non-delegable duty to the public, including Plaintiffs and Class members, to conduct their business, in particular the maintenance, operation, ownership, control, construction, maintenance, possession, management and supervision, operated the natural gas supply and/or infrastructure (including, but not limited to, compressor stations, processing plants, city gates, valves (flow, pressure control, relief), expansion tanks, distribution lines, transmission lines, service lines, regulators and meters) (collectively for this Count, "Infrastructure"), to supply and distribute natural gas to Aquidneck Island, through their gas transmission lines, substations, and M&Rs, in a manner that did not threaten harm or injury to the public welfare.

92. Defendants, by acting and/or failing to act, as alleged herein above, created a condition that was harmful to the health of the public, including Plaintiffs and Class members, and created a loss of gas and fire and explosion hazard and other potentially dangerous conditions to Plaintiffs' and the Class' property, which interfered with the comfortable occupancy, use, and/or enjoyment of Plaintiffs' and the Class' property. This interference is both substantial and unreasonable.

93. Plaintiffs and Class members did not consent, expressly or impliedly, to the wrongful conduct of the Defendants.

94. The hazardous condition which was created by and/or permitted to exist by Defendants affected a substantial number of people at the same time within the general public, including Plaintiffs and Class members, and constituted a public nuisance.

95. As a direct and legal result of the conduct of Defendants, Plaintiffs and Class members suffered harm that is different from the type of harm suffered by the general public. Specifically, Plaintiffs and Class members lost the occupancy, possession, use, and/or enjoyment of their land, real, and/or personal property, including, but not limited to; a reasonable and rational fear that the area is still dangerous; a diminution in the fair market value of their property; an impairment of the ability to sell their property.

96. As a further direct and legal result of the conduct of Defendants, Plaintiffs and Class members have suffered, and will continue to suffer, inconvenience, discomfort, anxiety, fear, worries, annoyance, and/or stress attendant to the interference with Plaintiffs' occupancy, possession, use and/or enjoyment of their property.

97. A reasonable, ordinary person would be annoyed or disturbed by the condition created by Defendants, and the Gas outage.

98. Defendants' conduct is unreasonable and the seriousness of the harm to the public, including Plaintiffs and Class members, outweighs the social utility of Defendants' conduct. There is little or no social utility associated with causing a gas outage affecting in excess of 7,500 customers on one of the coldest days of the year for, in many cases, several weeks.

99.   The unreasonable conduct of Defendants is a direct and legal cause of the harm, injury, and/or damage to the public, including Plaintiffs and Class members.

100.   Defendants have individually and/or collectively failed to and refused to conduct proper inspections and to properly inspect and repair its equipment and LNG facilities in order to ensure the safe delivery of gas to residents and businesses through the operation of gas transmission lines in the affected area, and Defendants' individual and/or collective failure to do so exposed every member of the public to a foreseeable danger of personal injury, death, and/or a loss of or destruction real and personal property.

101.   Defendants' conduct set forth above constitutes a public nuisance and Plaintiffs have standing to maintain an action for public nuisance because the nuisance is especially injurious to Plaintiffs and Class members because, as described above, it is injurious and/or offensive to the senses of Plaintiffs, unreasonably interferes with the comfortable enjoyment of their properties, and/or unlawfully obstructs the free use, in the customary manner, of their properties.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, including interest, costs and attorneys fees, as well as an order enjoining the Defendants from operating the Infrastructure, gas transmission lines and equipment in an unsafe and harmful way and requiring the Defendants analyze, identify and correct deficiencies as well as implement processes and procedures.

## COUNT SIX
## BREACH OF EXPRESSED AND IMPLIED WARRANTIES

102.   Plaintiffs re-allege the allegations contained in the preceding Paragraphs of the Complaint, and by reference, makes them part of this Count.

103.   The Plaintiffs were businesses whom the Defendants could reasonably have expected to use, consume, or be affected by the Defendants' gas products.

104.   The Defendants warranted expressly and impliedly, that the gas products described above were merchantable, safe, and fit for their ordinary and the particular purposes and requirements of the Plaintiffs.

105.   The Defendants had reasons to know of the particular purposes for which their gas products would be used.

106.   The Plaintiffs relied upon the Defendants' skill and judgment in selecting suitable gas products and providing a safe mechanism for the distribution of the natural gas products. (i.e. natural gas vs LNG at the Portsmouth M&R take station)

107.   The Defendants breached these warranties, in that the gas distribution that was sold was not merchantable, safe, suitable, or fit for their ordinary or particular purposes.

108.   As a direct and proximate result of the Defendants' breach of warranties, the Plaintiffs suffered a loss of their business, lost wages, lost profits and other great damages.

WHEREFORE, the Plaintiffs demand compensatory lost income, property damage, interest, attorneys fees and other damages that the Court deems meet and proper plus interest and costs.

## PRAYERS FOR RELIEF

109.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

A.   For these reasons, Plaintiffs also seek a permanent injunction ordering that Defendants stop continue to abate the existing and continuing nuisance described above, including the following:

B.   Plaintiffs also seek an order directing Defendants;

(1)   Improvements in Gas Long-Range Planning: Prior to January 21, 2019, the Division had identified problems with the way that Narragansett Electric performs its long-range capacity planning and had taken steps to recommend improvements to that planning process, including forecasting deficiencies.

(2)   Winter Deployment of LNG Facilities on Aquidneck Island: Considering the event of January 21 and the Division's scrutiny. Plaintiffs request that the NG deploy temporary LNG facilities on Aquidneck Island each winter to address the need to have capacity that meets hourly peaks, including on the gas design days that have the greatest demand for gas. The presence of LNG facilities will also serve as a contingency resource on non-design days in the event of a low-pressure condition occurring on the Algonquin system in the future.

(3)   Evaluation of Reinforcing the Lateral Serving the Portsmouth M&R take Station: Aquidneck Island is served by only one M&R station at Portsmouth, which, in turn is served by a single six-inch lateral pipeline. However, the Algonquin G-System leading up to the lateral has both twelve-inch and six-inch pipes. Narragansett Electric should be ordered to engage with Enbridge/Algonquin to determine the feasibility of reinforcing service into Portsmouth by having Algonquin add a twelve-inch pipe in parallel with the existing six-inch pipe.

(4)   Implementation of Demand Response Initiatives on Aquidneck Island: In addition to reinforcing the system, Narragansett Electric should be ordered to implement a demand response program designed to reduce peak hourly demand at the Portsmouth take station. Such a program also could mitigate or prevent the effects

of low-pressure conditions during cold weather events that might threaten reliable service.

(5)     Contingency Scenario System Modeling and Emergency Response Planning: Given the vulnerability of Aquidneck Island to gas low-pressure conditions, NG should be ordered to implement a scenario-based contingency planning process. Such process should include an annual scenario modeling and planning process that leads to the development of a detailed emergency response plan.

(6)     Evaluation of the Feasibility of Establishing Sectionalizing Districts in Newport: The low-pressure distribution system in Newport was not capable of being sectionalized to isolate problems on the system. Narragansett Electric should be ordered to conduct a thorough study of this issue to evaluate the feasibility of establishing sectionalizing districts for Aquidneck Island and other potential low-pressure risk areas across Rhode Island.

(7)     That any costs incurred by the Defendants as a result of the outage be absorbed by the Defendants and not passed down to the Rate payers.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES**

Plaintiffs,
By their Attorneys,
**BRIAN CUNHA & ASSOCIATES, P.C.**

/s/ Brian R. Cunha

Brian R. Cunha, Esq.
311 Pine Street
Fall River, MA 02720
Tel: (508) 675-9500
Fax: (508) 679-6360
R.I.#4074

Dated:   November 7, 2019